# AFFIDAVIT OF ATF SPECIAL AGENT SHERVIN DHANANI

I, Special Agent Shervin Dhanani, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been employed as an ATF Special Agent since August, 2015 and I was previously employed as a Special Agent with the Diplomatic Security Service ("DSS") since January, 2009. As an ATF Special Agent, I am currently assigned to the Boston Group II Field Office and my duties include, among other things, the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, the use of firearms in drug trafficking crimes, and the investigation of violations of laws related to explosives violations and incendiary (arson) fires. I am a graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.

2. During my law enforcement career, I have participated in investigations involving firearms and drug trafficking, firearms possession by prohibited persons, the use of firearms in furtherance of drug trafficking crimes, passport and visa fraud, and aggravated identity theft, many of which have occurred in Massachusetts.

3. Based on my training and experience, I know that it is a violation of Title 18, United States Code, Section 922(a)(1)(A) and (B) for any person who is not licensed to deal, import or manufacture firearms and ammunition to willfully engage in the business of dealing, importing or manufacturing firearms and ammunition.

4. Based on my training and experience, I also know that it is as violation of Title 18, United States Code, Section 371 for two or more persons to conspire to commit any offense against the United States.

5. Having so stated, I make this affidavit in support of a criminal complaint charging SAMUEL JEAN with conspiracy to violate the law and engaging in the business of dealing in firearms and ammunition without a license.

6. The statements contained in this affidavit are based on my participation in this investigation, conversations with other ATF agents involved in the investigation, and on information provided to me by officers of the Boston Police Department ("BPD"). This affidavit is submitted for the limited purpose of establishing probable cause to believe that SAMUEL JEAN violated: 18 U.S.C. §922(a)(1)(A) and (B) and 18 U.S.C. §371. It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of the investigation.

7. This investigation was developed through firearm and ammunition purchases and observations by a Cooperating Witness ("CW") coupled with information that fellow investigators and I have developed during the conduct of the investigation.

**CONTROLLED PURCHASES OF FIREARMS**

8. The CW has provided specific information about an individual engaged in criminal activity. The CW identified the individual as "Dutchess", and described him as a black male, early 30's, 6' in height, medium build, shaved head with facial hair (later positively identified as JEFFREY JOSEPH, date of birth xx/xx/85, and hereinafter referred to as "JOSEPH"). According to the CW, JOSEPH is an active crack cocaine dealer who possesses and sells multiple firearms. The CW said he/she could make controlled purchases of crack cocaine and firearms from JOSEPH.

9. The CW said JOSEPH uses a cellular telephone, number of (857) 417-7124, in order to facilitate his drug and firearms activities. The CW knows buyers to telephone JOSEPH at this number.

10. Upon reviewing JOSEPH's criminal history, I learned that he has previously had at least six civil restraining orders from at least four individuals, has been arrested at least eighteen times with at least ten convictions, at least two of which are felonies.

**THE SEPTEMBER 7, 2016 SALE OF A FIREARM BY JOSEPH TO THE CW**

11. On September 7, 2016, at a prearranged location, fellow investigators and I met with the CW and planned for an undercover operation involving the controlled purchase of a firearm from JOSEPH. At our direction, the CW had been in telephone communication with JOSEPH and arranged for a firearm transaction to occur at the CW's residence. Prior to the CW going to meet JOSEPH, we searched the person of the CW, finding no contraband, and equipped him/her with a transmitting device (body wire) and an audio/video recording device. We provided the CW with government money to be used to purchase a firearm from JOSEPH.

12. We then drove the CW to an area in close proximity to his/her residence and then directed the CW to walk directly to his/her apartment. Shortly before 7:00 pm, the CW arrived in his apartment.

13. Shortly after 7:00 pm, JOSEPH called the CW and told him/her that he was downstairs. The CW then proceeded downstairs where JOSEPH was waiting outside the CW's apartment building. The CW opened the building door for JOSEPH. JOSEPH was seen wearing the same red shirt and jean shorts that he was seen wearing one hour earlier by investigators during surveillance. Once in the hallway, JOSEPH handed the CW a silver and black semi-automatic pistol with six rounds of 9 mm ammunition. JOSEPH told the CW that the firearm

was loaded. The CW handed JOSEPH $900 dollars of government money which JOSEPH then counted. JOSEPH told the CW that he had additional firearms in the vehicle that he arrived in that he would eventually sell.

14. Immediately after the transaction, JOSEPH exited the CW's apartment building and was observed by the CW and several surveillance units (including Special Agents Keltar Mui, Peter Kelley, Michael Romeo, Brian Higgins and Boston Police Sergeant John Broderick) wearing a red shirt and red hat and entering the front passenger seat of a blue Lexus sedan with Massachusetts license plate number: 6WEC40 (the "Target Vehicle"). Surveillance units observed the Target Vehicle being operated by an unknown black male with JOSEPH in the passenger's seat. Several minutes later, surveillance units observed the Target Vehicle again leaving the Bunker Hill Housing Development and being operated by the same unknown black male with no one in the passenger's seat. During the surveillance, Boston Police units (Officers Walter Supry and Jamie Conly) assisting with the operation observed that one of the headlights was not working properly on the vehicle. Boston Police officers therefore conducted a traffic stop of the Target Vehicle and confirmed it to be a blue Lexus ES 350 sedan (license plate: 6WEC40) registered to Denise DESIR, DOB: 12/03/1953, with a registered address of 43 Cottage Street, Everett, Massachusetts. The driver of the vehicle provided his active driver's license which revealed his name to be: Samuel JEAN, DOB: 01/17/1994 with an address 43 Cottage Street, Everett, Massachusetts (the "Target Location"). There were no other occupants in the vehicle at the time of the stop. JEAN was released from the stop with a warning.

15. Upon reviewing JEAN's Massachusetts criminal history record, I learned that DESIR is listed as the mother of JEAN and that JEAN's last known address on the record is the Target Location. Additionally, I confirmed that JEAN does not have a valid Massachusetts

License to Carry (LTC) firearms, Firearms Identification Card (FID) nor a valid Federal Firearms License (FFL) to deal firearms.

16. The CW left his/her apartment with the firearm and ammunition that he had just purchased from JOSEPH, and then walked back to a pre-designated location and met investigators for evidence transfer. Special Agent Shibley searched the person of the CW, finding no contraband. The CW handed to us the firearm and a magazine with the ammunition that he/she had just purchased from JOSEPH. The firearm, ammunition and the audio/video recordings of the transaction were processed as ATF evidence.

**THE SEPTEMBER 12, 2016 SALE OF TWO FIREARMS AND AMMUNITION BY JOSEPH TO THE CW AND SURVEILLANCE OF JEAN**

17. On September 12, 2016 at approximately 3:00pm, I directed the CW to place a recorded phone call to JOSEPH in my presence at phone number: (857)417-7124 to follow up on a firearm purchase that he/she and JOSEPH had previously discussed. During the phone call, JOSEPH indicated that an associate of his had two firearms for sale, one of which was a revolver. The CW asked if he/she could have a discount on the purchase since he/she was buying two firearms and JOSEPH told the CW that he would contact the seller and call the CW back.

18. Several minutes after the phone call, JOSEPH called the CW back and stated that the seller wanted approximately $1875 for the sale of the two firearms. JOSEPH asked the CW to proceed to O'Reilly Way in Charlestown to meet JOSEPH and purchase the firearms. The CW stated that he would be there at approximately 5:00pm that same day. At approximately 4:30pm, JOSEPH called the CW and stated that the seller of the firearms was on his way to Charlestown.

19. On that same date, at a prearranged location, fellow investigators and I met with the CW and planned for an undercover operation involving the controlled purchase of two firearms from JOSEPH. At our direction, the CW had been in telephone communication with JOSEPH and arranged for a firearm transaction to occur in an ATF undercover vehicle that the CW would be driving. Prior to the CW going to meet JOSEPH, we searched the person of the CW, finding no contraband, and equipped him/her with a transmitting device (body wire), an audio/video recording device and provided him/her with an ATF undercover vehicle equipped with an audio/video recording device and audio transmitting device. We provided the CW with government money to be used to purchase two firearms from JOSEPH.

20. At approximately the same time the CW was being prepared, Boston Police Detective/ATF Task Force Officer John O'Connor and Boston Police Sergeant John Broderick took up surveillance positions near the Target Location. During the surveillance, O'Connor and Broderick observed a black Nissan Altima with MA license plate number 691KZ1 (determined to be registered to Kayaki BATTLE – DOB: 07/24/1992) arrive in front of the Target Location occupied with one black male in the driver's seat. At the same time, they observed JEAN exit the Target Location with a white cloth item in his hand and enter the Altima on the front passenger side. Surveillance units then observed the vehicle park and JEAN and BATTLE exit the vehicle. JEAN and BATTLE then briefly conversed with several other unidentified individuals on the street. Several moments later, investigators observed JEAN and BATTLE walk over to the Target Vehicle and JEAN sat in the driver's seat and BATTLE entered the front passenger side. Detective O'Connor and Sergeant Broderick followed the Target Vehicle towards Revere Beach Parkway in Everett but were unable to continue following the Target Vehicle without being noticed. Investigators therefore ended surveillance of the Target Vehicle

and drove to the area of the Bunker Hill Housing Development (BHHD) in Charlestown. Detective O'Connor later confirmed the identities of BATTLE and JEAN through a comparison with their MA driver's license photographs.

21. On that same date shortly before 5:00 pm, the CW departed the staging location in the ATF undercover vehicle and proceeded to O'Reilly Way in Charlestown while being monitored by surveillance units. Over the next hour, the CW and JOSEPH had contact telephonically and JOSEPH indicated several times that the seller of the firearms was on his way. At around 6:15 pm, the CW parked his vehicle on O'Reilly Way. Several minutes later, JOSEPH appeared with a Starbucks shopping bag (which was later determined to contain two handguns and seventeen rounds of ammunition) and handed it to the CW in exchange for $1900 of government funds. Several moments later, Boston Police Detective/ATF Task Force Officer John O'Connor observed JEAN driving the Target Vehicle driving west on Medford Street.

22. The CW departed O'Reilly Way following the transaction and drove directly to a pre-designated location and met me and other investigators for evidence transfer. We searched the person of the CW, finding no contraband. The CW handed to me: one handgun loaded with a magazine containing twelve rounds of ammunition, a second unloaded handgun, and five additional rounds of ammunition, all of which he/she had just purchased from JOSEPH. The firearms, ammunition and the audio/video recordings of the transaction were processed as ATF evidence.

**THE SEPTEMBER 26, 2016 SALE OF TWO FIREARMS AND AMMUNITION BY JOSEPH TO THE CW AND SURVEILLANCE OF JEAN**

23. On September 26, 2016 at a prearranged location, fellow investigators and I met with the CW and planned for an undercover operation involving the controlled purchase of two firearms and ammunition from JOSEPH. At our direction, the CW had been in telephone

communication with JOSEPH and arranged for a firearm transaction to occur in an ATF undercover vehicle that the CW would be driving. Prior to the CW going to meet JOSEPH, we searched the person of the CW, finding no contraband, and equipped him/her with a transmitting device (body wire), an audio/video recording device and provided him/her with an ATF undercover vehicle equipped with an audio/video recording device and audio transmitting device. We provided the CW with government money to be used to purchase two firearms from JOSEPH.

24. At approximately the same time the CW was being prepared, Boston Police Detective/ATF Task Force Officer John O'Connor and Special Agent Lisa Rudnicki took up surveillance positions near the Target Location. During the surveillance, O'Connor and Rudnicki observed the Target Vehicle parked in the driveway at approximately 3:45 pm. Shortly after 4:00pm, Rudnicki and O'Connor observed JEAN exiting the Target Location with a backpack and enter the driver's seat of the Target Vehicle. SA Rudnicki observed JEAN to be wearing a white long-sleeve shirt, and a black knitted hat. JEAN was then observed driving the Target Vehicle away from his residence on Cottage Street. Surveillance on JEAN was then terminated as it was difficult for agents to follow the Target Vehicle without being noticed.

25. At approximately 4:15pm, the CW departed the staging location in the ATF undercover vehicle and proceeded to O'Reilly Way in Charlestown while being monitored by surveillance units. The CW then parked the vehicle on O'Reilly Way. Several minutes later, JOSEPH approached the driver's side of the ATF UC vehicle arriving on foot and handed the CW a Bath and Body Works shopping bag (later confirmed to contain two handguns, sixty-five rounds of ammunition and a firearm holster); the CW then handed JOSEPH $2000 of government money. JOSEPH immediately departed the location on foot.

26. The CW departed O'Reilly Way following the transaction and drove directly to a pre-designated location and met investigators for evidence transfer. The investigators searched the person of the CW, finding no contraband. The CW handed to me: two handguns (both from which the CW had removed the magazines), sixty-five total rounds of ammunition, and a firearm a holster, all of which he/she had just purchased from JOSEPH. The firearms, ammunition, holster, and the audio/video recordings of the transaction were processed as ATF evidence.

**THE OCTOBER 3, 2016 SALE OF TWO FIREARMS AND AMMUNITION BY JOSEPH TO THE CW AND SURVEILLANCE OF JEAN**

27. On October 3, 2016 at a prearranged location, fellow investigators and I met with the CW and planned for an undercover operation involving the controlled purchase of two firearms and ammunition from JOSEPH. At our direction, the CW had been in telephone communication with JOSEPH and arranged for a firearm transaction to occur in an ATF undercover vehicle that the CW would be driving. Prior to the CW going to meet JOSEPH, we searched the person of the CW, finding no contraband, and equipped him/her with a transmitting device (body wire), an audio/video recording device and provided him/her with an ATF undercover vehicle equipped with an audio/video recording device and audio transmitting device. We provided the CW with government money to be used to purchase two firearms from JOSEPH.

28. On that same date at approximately 4:05pm, the CW departed the staging location in the ATF undercover vehicle. Several minutes later, the CW arrived on O'Reilly Way and parked the vehicle. JOSEPH met the CW in the street while they waited for the delivery of the firearms. While they were waiting, JOSEPH indicated to the CW that the seller of the firearms lives in Everett.

29. Shortly after 4:30pm on that same date, Boston Police Detective/ATF Task Force Officer John O'Connor observed JEAN exit his home at the Target Location and walk onto Green Street disappearing from view. O'Connor observed JEAN carrying a black backpack. Shortly before 5:00pm, Special Agents Brian Higgins and Michael Romeo observed JEAN driving the Target Vehicle heading south on Route 99 towards Boston.

30. At approximately 5:00pm, Group Supervisor Thomas Crowley observed JEAN in the Target Vehicle on Bunker Hill Street. Crowley then observed JEAN turn right on Monument Street and right onto O'Reilly Way. Moments later, JEAN drove by the CW and JOSEPH's location on O'Reilly Way in the Target Vehicle and JOSEPH motioned to JEAN to go around the block. JOSEPH then began walking north away from O'Reilly Way towards Walford Way. Immediately afterwards at 5:04pm, Special Agent Shibley and I observed the Target Vehicle turn left onto Tufts Street from O'Reilly Way.

31. Several minutes later, the CW called JOSEPH on his cellular phone and JOSEPH indicated that he was on his way back to the CW's location on O'Reilly Way. Moments later, JOSEPH walked back onto O'Reilly Way from the direction of Walford Way holding a brown paper bag. JOSEPH then placed the brown paper bag in the ATF undercover vehicle and briefly showed the CW two firearms and ammunition inside the bag. The CW then handed JOSEPH $2060 of government money and JOSEPH sat inside the ATF undercover vehicle to count the money. Shortly before 5:15pm, JOSEPH departed with the money and the CW then departed in the ATF UC vehicle.

32. At 5:16pm, Special Agent Shibley and I observed the unoccupied Target Vehicle in a parking lot on the west side of Walford Way adjacent to 82 Walford Way. Shortly after 5:30pm, Boston Police Officers Brian Johnson and Jamie Conly also observed the Target

Vehicle in the same parking lot. At 5:38pm Group Supervisor Crowley and Special Agent Higgins observed the Target Vehicle on Medford Street heading West towards Revere. Special Agent Daniel Campbell also picked up surveillance of the Target Vehicle on Route 99 heading north. Special Agents Crowley, Campbell and Higgins followed the Target Vehicle all the way to Everett. At 5:50pm, Detective O'Connor and Special Agent Mui observed the Target Vehicle pull into the driveway adjacent to the Target Location and observed JEAN exit the Target Vehicle and enter the Target Location.

33. Following the controlled purchase, the CW drove directly to a pre-designated location and met investigators for evidence transfer. The investigators searched the person of the CW, finding no contraband. The CW handed to me: two handguns and thirty-five total rounds of ammunition which he/she had just purchased from JOSEPH. The firearms, ammunition, and the audio/video recordings of the transaction were processed as ATF evidence.

**THE OCTOBER 21, 2016 ATTEMPTED PURCHASE OF TWO FIREARMS BY THE CW FROM JEFFREY JOSEPH AND THE SUBSEQUENT INTERVIEW OF JOSEPH**

34. On October 21, 2016 at a prearranged location, fellow investigators and I met with the CW and planned for an undercover operation involving the controlled purchase of two firearms and ammunition from JOSEPH. At our direction, the CW had been in telephone communication with JOSEPH and arranged for a firearm transaction to occur in an ATF undercover vehicle that the CW would be driving. Prior to the CW going to meet JOSEPH, we searched the person of the CW, finding no contraband, and equipped him/her with a transmitting device (body wire), an audio/video recording device and provided him/her with an ATF undercover vehicle equipped with an audio/video recording device and audio transmitting

device. We provided the CW with government money to be used to purchase two firearms from JOSEPH.

35. On that same date shortly after 12:15pm, the CW departed the prearranged location in the ATF undercover vehicle and arrived at the parking lot adjacent to 10 McNulty Court, Charlestown, MA. At approximately 12:25pm, JOSEPH approached the CW with an unknown male and handed the CW a shopping bag in exchange for $2000 of government money from the CW. After JOSEPH and his associate departed, the CW learned shortly afterwards that the shopping bag given to him/her did not contain any firearms and only contained a rock.

36. Several minutes later during the operation, Group Supervisor Crowley requested that all units attempt to locate JOSEPH and the $2000 of government money provided to him by the CW. Shortly before 12:30pm, Group Supervisor Crowley, SA Kelly, and Boston Police Officer Supry located JOSEPH who fled from investigators. After several minutes, agents and officers were able to detain him and recover $2000 of funds on his person.

37. At approximately 2:00pm, JOSEPH agreed to an interview by Special Agents Campbell and Kelly at Boston Police Station A-15 after he acknowledged his understanding of his Miranda rights. During the interview, JOSEPH confessed to having stolen $2000 from the CW while pretending to sell him/her a firearm. JOSEPH also confessed to investigators that he robs drug dealers.

38. During the interview, JOSEPH also provided information regarding an individual known to him as "SOUL." JOSEPH described him as a black male, heavy build, braided hairstyle who lives in a house on Cottage Street in Everett, MA. JOSEPH provided SOUL's phone number as (802)829-0797, stated that SOUL drives a blue Lexus with tinted windows, and

indicated that SOUL sells firearms and marijuana. At the conclusion of the interview, JOSEPH departed Boston Police Station A-15.

## CORROBORATION OF INFORMATION PROVIDED TO INVESTIGATORS BY JOSEPH AND BY THE CW

39. On November 1, 2016, I queried a commercially available public records database with the phone number, (802)829-0797, provided by JOSEPH as belonging to "SOUL." The results showed the subscriber of the phone number as Samuel JEAN with date of birth of: 01/17/1994, social security number: XX-XX-9292, and home address as the Target Location. I compared this information to JEAN's Massachusetts driver's license record (# S55512413) and learned that the name, date of birth, and social security number match in both the driver's license record and the public records database record.

40. Throughout the course of the investigation, the CW indicated that the phone number on which he/she was contacting JOSEPH to arrange firearms and narcotics purchases is: (857)417-7124. On October 27, 2016, Special Agent Shibley and I received subscriber information and call records for the aforementioned phone number from July 1, 2016 through September 29, 2016. The subscriber for the phone number is listed as Jeffrey JOSEPH.

41. On November 1, 2016, I reviewed the call records of JOSEPH's cellular phone for the following dates that the CW made controlled purchases of firearms from JOSEPH when JEAN was observed in the area (September 7, 2016, September 12, 2016, and September 26, 2016)[1]. On each of these dates, JEAN's phone number (802-829-0797) is listed before and/or after the CW's phone number is listed. This activity indicates that JOSEPH either called, sent text messages to and/or received calls or text messages from JEAN's telephone during the same

[1] Note that I did not have call records for JOSEPH's phone after 09/29/2016 and was therefore unable to review JOSEPH's call records for the controlled firearm purchase on 10/03/2016.

period that investigators and I directed the CW to contact JOSEPH to arrange for firearms purchases.

## REVIEW OF JEAN'S CRIMINAL RECORD AND STATUS AS A FEDERAL FIREARMS LICENSEE

42. I have reviewed JEAN's criminal record as maintained by the Massachusetts Criminal History Systems Board. It revealed that JEAN has been arrested seven times and has no criminal convictions as an adult.

43. Special Agent Matthew Shibley and I contacted ATF Supervisory Industry Operations Investigator Wayne Bettencourt who confirmed that SAMUEL JEAN has not been issued a federal firearms and license to deal, import or manufacture firearms and ammunition.

## CONCLUSION

44. Based on the foregoing, I submit that there is probable cause to believe that, between on or about September 7, 2016 and on or about October 3, 2016, SAMUEL JEAN conspired with JOSEPH to violate the law and dealt in firearms and ammunition without a federal firearms license, in violation of Title 18, United States Code, Section 371 and Title 18, United States Code, Section 922(a)(1)(A) and (B).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

SHERVIN DHANANI
SPECIAL AGENT, ATF

Subscribed and sworn to before me
this 30 day of November, 2016

HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE